## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **Danyell Cruell,** ) | Civil Case No. 2:15-cv-3377-TLW-MGB |
| ) | |
| **Plaintiff,** ) | |
| v. ) | |
| ) | **REPORT AND RECOMMENDATION** |
| **Carolyin W. Colvin, Commissioner** ) | |
| **of Social Security,** ) | |
| ) | |
| **Defendant** ) | |
| _____ ) | |

Plaintiff Danyell Cruell ("Claimant"), through counsel, brought this action to obtain judicial review of an unfavorable final administrative decision denying benefits on her applications for Title II disability benefits ("DIB") and Title XVI supplemental security income (SSI") under the Social Security Act ("SSA"). See Section 205(g) of the SSA, as amended, 42 U.S.C. § 405(g). This matter was referred to the assigned United States Magistrate Judge for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., and 28 U.S.C. § 636(b)(1)(B). Having carefully considered the parties' briefs, administrative record, and applicable authority, the Magistrate Judge recommends that the Commissioner's final decision is supported by substantial evidence and should be **affirmed**, based on the following proposed findings of fact and conclusions of law:

**I.  Relevant Law**

The SSA provides that disability benefits are available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). For purposes of the statute, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). As the Commissioner correctly indicates, the Social Security regulations set forth a five-step sequential process that considers a claimant's age, education, and work experience in addition to [the claimant's] medical condition. (AR 13, citing 20 C.F.R. §§ 404.1520(a), 416.920(a)). The Fourth Circuit Court of Appeals has explained that, to be entitled to benefits, "[t]he claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity ["RFC"] to (4) perform [the claimant's] past work or (5) any other work." *Albright v. Comm'r*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). The claimant bears the burden of production and proof through the fourth step. "If the claimant reaches step five, the burden shifts to the government." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*). In the present case, the ALJ determined that Claimant was not disabled at the fifth step of the sequential process.

## II. Background

The relevant facts have been extensively set forth in the ALJ's decision (AR 20-33), Claimant's brief (DE# 9 at 1-22), and the Commissioner's response brief (DE# 10 at 4-13). Those facts are summarized here: Claimant was born on February 4, 1976 (a "younger" individual), has a limited education, is literate and communicates in English, is married, and lives with her husband and teenage daughter. (AR 31, 41-42, 213). She has a driver's license and drives her car. (AR 73, 342-43). She has previous work experience as a cashier ("light, unskilled, SVP level 2"), customer service ("light, semi-skilled, SVP level 4"), packer ("medium, unskilled, SVP 2"), parts tester ("light, semi-skilled, SVP 2"), and hotel clerk ("light, SVP 4"). (AR 31, 46-55, 84-92). Claimant

testified she had also worked as a machine operator ("medium") and dry clean presser ("light"), but those jobs were deemed "not relevant" based on earnings records. (AR 92, 94).[1]

Claimant's reported activities of daily living include walking for exercise, shopping, doing household chores (i.e. vacuuming, cooking, washing dishes, laundry), reading books, watching television, and driving her car to appointments and other errands. (AR 28, 73, 234-36, 342, 543). She told her doctor in July 2008 that she is the "main one in her home to do household tasks" (AR 402), but later testified that her husband and daughter do most of the housework. (AR 27, 75 "I end up getting my husband or my daughter to help me."). She is able to bathe and take care of her own hygiene. She is able to write checks and make her own financial decisions, although she testified that her "husband handles the money mostly." (AR 24, 45, 335, 344).

Claimant last worked on March 31, 2008 at age 32. Over three years later, on December 15, 2011, she filed applications for DIB and SSI benefits, alleging disability as of March 31, 2008. (AR 214).[2] Claimant alleged disability due to degenerative disc disease in her back, obesity, GERD, hypothyroidism, bipolar, depression, anxiety, and PTSD.[3] Less than a year after applying for disability, Claimant had a successful laminectomy (L5, S1 level) on December 12, 2012 and

---

[1] Counsel stipulated that the ALJ had "everything" in the record. (AR 94).

[2] Claimant told her doctor on May 28, 2008 that she had "quit" such job. (AR 538, Ex. 17F). The ALJ noted the discrepancy. (AR 27, citing AR 538, 17F). Additionally, on July 17, 2008, Claimant inconsistently explained to another doctor that she had actually been fired from that job because her son had stolen her car, she could not get to work, she had "poor performance" anyway, that missing work was the "last straw," and that she was therefore "let go." (AR 401). The ALJ noted that although Claimant alleged she had been fired from previous jobs due to altercations with supervisors, Claimant had told another doctor that she had "quit" her 2007 job because she was working 60 hours a week. (AR 27, citing Ex. 17F). *See, e.g., Guthrie v. Colvin*, 2014 WL 2575318, *7 (E.D.N.C. 2014) (ALJ could properly note that claimant left job for reasons other than alleged disability).

[3] "GERD" is gastroesophageal reflux disease. See http://www.webmd.com/heartburn-gerd/guide ("In most cases, GERD can be relieved through diet and lifestyle changes."). As for obesity, Claimant indicated in her 12/15/2011 application that she is 5'5" and weighs 178 lbs. (AR 214). She told the consulting evaluator on 4/6/2012 that she was 5'7" and weighed 160 lbs. (AR 341-43). At the 12/19/2013 hearing, she testified that she is 5'4" and weighs 197 lbs. (AR 43).

was discharged the next day. [4] In support of her disability application, Claimant submitted medical records, including records from family doctor Dr. Ronald DeGarmo, D.O. (from 1999 to 2013)[5] and records from treating surgeon Dr. Christopher Vanpelt, M.D. (regarding her 2012 back surgery and recuperation). The records of the treating surgeon indicate he recommended that Claimant ride a stationary bicycle or do low impact aerobics for exercise, and that Claimant increase her walking to two miles daily. (AR 502-03, follow-up notes 1/3/2013).[6] In light of the alleged mental impairments, the ALJ obtained a comprehensive mental examination and evaluation on April 16, 2012 by consulting examiner Bruce A. Kofoed, Ph.D. (AR 341-44, Report, noting that Claimant "has not been in mental health care for the last four to five years"). After applying for disability, Claimant also had monthly visits with psychologist Chrys Harris, Ph.D. from May 2012 until December 2013.

Although Claimant told the consulting examiner that she did not use illegal drugs, the evidence of record reflects that Claimant has a history of substance abuse.[7] (See AR 342,

---

[4] A claimant must demonstrate that her impairments "lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509, 416.909 (the "duration" requirement); and see §§ 404.1522(b), 416.922(b) (discussing improvement within 12 months).

[5] Many records from periodic check-ups concern non-disabling temporary matters, such as colds, congestion, digestive complaints, constipation, and/or routine prescription refills (*See, e.g.,* AR 329-30 refill; AR 331 nasal drainage, cough; AR 350 food allergy; AR 355 sneezing, coughing; AR 481 constipation; AR 533, 5/13/2013 thyroid check, refill; AR 529, 7/24/2013, refill; AR 531, 7/16/2013 refill, B12 shot, digestive issue). Some records also reflect complaints of lower back or shoulder pain prior to her successful surgery (AR 354 recommending Tylenol; AR 356, 495-98, seeking pain medication for alleged shoulder injury after lifting a chair; examination and x-ray showed no fracture, no dislocation, no obvious signs of trauma).

[6] Specifically, the treating surgeon's post-surgical recommendation indicated: "it is very important that you begin a progressive walking program….You will need to increase your walking program up to two miles per day over the next four weeks….this is a vital part of your recovery." (AR 468). He also recommended that she quit smoking. (AR 466 ("Obesity, smoking, and sedentary lifestyle greatly increases your risk for illness").

[7] The Contract with America Advancement Act of 1996, Pub. L. No. 104-121, § 105(a)(1)(C), 110 Stat. 852, amended the definition of "disability" under Title II of the SSA to bar benefits for any person whose disability is based on alcoholism or drug addiction. 42 U.S.C. 423(d)(2)(C). Title II now states: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." *Id.*

evaluation 4/16/2012, noting history of alcohol abuse, cannabis dependence, and tobacco use; AR 402, evaluation 7/17/2008, noting recent use of marijuana; AR 393, treatment notes 8/5/2008, "continuous" alcohol and cannabis abuse; AR 541, 547, treatment notes 7/25/2007, noting daily marijuana use). With respect to alcohol, the records reflect that Claimant reported to doctors that she consumed more than five alcoholic beverages per day, drank at least 48 oz. of beer daily, and occasionally drank a six-pack of beer on weekends. (AR 342, 384, 402, 413, 488, 525). A psychiatric evaluation on July 17, 2008 indicated that Claimant's longest period of sobriety from alcohol had been five days. (AR 402). Claimant reported smoking one pack daily, and her treating physician noted in 2013 that Claimant was a "current every day smoker." (AR 342, 410, 488, 529).

Claimant's applications were denied initially and on reconsideration. (AR 158). Upon request, Administrative Law Judge Harold Chambers ("ALJ") held a hearing on December 19, 2013. (AR 36-102, Hrg. Tr.). Claimant (represented by counsel), her husband, and vocational expert Carl S. Rock Weldon ("VE") all testified. After considering all the evidence, the ALJ found that Claimant had "severe" impairments and could not perform her past work, but retained the RFC to perform a limited range of light work, with various postural, mental, and environmental restrictions. (AR 25-26). Such restrictions included a limitation to "simple, routine, and repetitive tasks performed in a work environment which is free of any kind of fast-paced productions requirements…can involve only simple, work-related decisions … few if any changes in the workplace introduced on a gradual basis...interaction with the public is minimal … defined as 0 to 6 percent of the work time…only occasional interaction with co-workers" (AR 95-96).

Based on a lengthy hypothetical question that included all the Claimant's restrictions that the ALJ found credible, the VE testified that Claimant could perform "light, unskilled" work as a garment sorter, hand packager, and an inspector (with a total of 3,700 jobs in upstate South

Carolina, and 1,038,000 jobs nationally). (AR 94-97).[8] The ALJ found that, considering Claimant's age, education, work experience and RFC, there were jobs that existed in significant numbers that she could perform. (AR 31-32). After reviewing all the evidence, the ALJ issued a decision, finding that Claimant was not disabled within the meaning of the SSA from the alleged onset date (March 31, 2008) through the date of decision (March 21, 2014). (AR 32).

Claimant then submitted additional information to the Appeals Council, including a transcript of a sworn "statement" by Dr. DeGarmo on June 24, 2014, indicating that his records, which had repeatedly indicated "normal" mental findings, were "computer generated" and not always accurate. (AR 555-575). Such post-decision "statement" is not an affidavit by Dr. DeGarmo, but rather, consists of a twenty-page transcript of his answers to leading questions by Claimant's counsel (without the presence of opposing counsel for objection or cross-examination). Dr. DeGarmo indicated that as a family practitioner, he does not "focus much on mental status" and does not always click the psychiatric tab for his computer records (AR 571-72).

Claimant also submitted a post-decision letter (dated 6/4/15) from psychologist Denise K. Crockett, Ph.D., LPC, CTS (who had taken over from Chrys Harris, Ph.D., who last saw Claimant in 2013). (AR 7-8). The letter indicated that Claimant's first visit with Dr. Crockett had been on August 7, 2014, and that she now wished to add a diagnosis of "complex PTSD" as of September 2014, which is after the ALJ's decision in March 2014. (AR 7). Dr. Crockett also opined that she thought the Claimant's condition got "worse" in 2015 after the Claimant's son died.

On June 30, 2015, the Appeals Council denied Plaintiff's request for further review. The ALJ's decision is the Commissioner's final decision for purposes of judicial review (AR 1-4).

---

[8] In light of the Claimant's history of substance abuse, the ALJ appropriately limited her to occupations that do not involve the handling, sale, or preparation of alcoholic beverages or access to narcotic drugs. (AR 95).

### III. Standard of Review

The Court's review of the Commissioner's final decision is limited to: (1) whether substantial evidence supports such decision; and (2) whether the Commissioner applied the correct legal standards. 42 U.S.C. §§ 405(g), 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Smith v. Heckler*, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting *Perales*, 402 U.S. at 401); *Hunter*, 993 F.2d at 34 (same). Substantial evidence is defined as "more than a mere scintilla but less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 637–38 (4th Cir. 1996).

The reviewing court may not re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, so long as that decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. It is the Commissioner's duty to make findings of fact and resolve conflicts in the evidence. *Id.* at 1456; *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979) ("the court does not find facts or try the case *de novo* when reviewing disability determinations"); *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976) (same). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the court would decide the case differently. *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982).

### IV. Discussion

**Issue 1: Whether the ALJ's Weighing of Dr. DeGarmo's Opinion is Supported by Substantial Evidence**

Residual functional capacity ("RFC") is "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a). On February 29, 2012, Dr. DeGarmo completed a one-page form for Claimant. (AR 335, Ex. 2F). Such form indicated a diagnosis of anxiety and depression,

and indicated that he had prescribed medication ("Prozac") that had helped her condition. (*Id*.). Dr. DeGarmo indicated that "psychiatric care was not recommended," but circled the word "Obvious" in response to question "Does the patient exhibit any work-related limitations in function due to the mental condition?" On November 7, 2013, Dr. DeGarmo completed a two-page RFC form for Claimant. (AR 552-54, Ex. 19F).[9] He noted diagnoses of lumbago, bipolar disorder, hypothyroid, and insomnia, and generally assessed that Claimant's prognosis was "fair." (AR 553). He opined that Claimant could walk a half a block; sit for 1 hour total per day; stand and/or walk for a total of 1 hour per day; would need a job which permits shifting positions at will from sitting, standing or walking; would need to take unscheduled breaks every 30 minutes for 10 minutes at a time; could occasionally lift 10 pounds; and could only grasp/turn/twist, perform fine manipulation, and reach 20% of the time (AR 554).[10]

Claimant argues that the ALJ did not properly weigh Dr. DeGarmo's opinions regarding her alleged functional limitations. (DE# 9 at 23-32). Claimant generally complains that the ALJ assigned "some weight" to the highly-restrictive opinion of this treating doctor and "failed to set forth good reasons for rejecting Dr. DeGarmo's opinion." (*Id*. at 25). On the contrary, the ALJ adequately explained his reasons for assigning "some weight" to such opinion. (AR 29-31). After discussing the medical evidence in considerable detail for several pages, the ALJ indicated that Dr. DeGarmo's opinion was:

> not entirely consistent with the evidence of record, including the May 2, 2013 treatment notes of Dr. Vanpelt showing that the claimant was doing

---

[9] Courts have recognized the "limited probative value" of such brief check-the-box forms, especially when they lack specific explanatory notes. *See, e.g., Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("check-the-box assessments without explanatory comments are not entitled to great weight"); *Shelton v. Colvin*, 2015 WL 1276903, *13 fn.6 (W.D.Va.) (same). Dr. DeGarmo's notes are minimal and do not refer to any diagnostic test results or objective medical findings.

[10] Claimant, however, testified that she could lift a gallon of milk, manipulate with her hands, had no trouble squatting, and could crawl and climb stairs. (AR 71-74).

> well, overall, and had had symmetrical strength in all major muscle groups in both lower extremities and no difficulty with ambulation and Dr. DeGarmo's own treatment notes showing that the claimant was alert and oriented to person, place, and time and had normal recent and remote memory, appropriate mood and affect for situation, normal judgment and insight, normal attention span and concentration, normal gait, normal station and stability, normal range of motion, motor, and sensory examinations, normal musculoskeletal inspection, palpation, stability, muscle strength, and tone, symmetrical and equal deep tendon reflexes, and unremarkable neurological examination on May 13, 2013, July 16, 2013, July 24, 2013, and September 5, 2013 (Exhibit 16F).

(AR 30, citing Ex. 16F and 19F). This provides substantial evidence to support the ALJ's decision.

Under the "treating physician rule," more weight is generally given to the opinion of a treating source, because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (listing criteria to consider when determining how much weight to give a treating opinion).[11] "Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Soc. Sec. Ruling 96–2p. It is well-settled that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *Breed v. Colvin*, 2013 WL 3717740, *4 (M.D.N.C.) (observing that "not all treating sources are created equal"), *aff'd by* 592 F.App'x 215 (4th Cir. Feb. 6, 2015).

The Commissioner correctly asserts that "[a]lthough the opinions of treating sources are generally given more weight, the ALJ is not required to accept them uncritically, and need not

---

[11] A regulatory change (effective March 26, 2012) renumbered, but did not affect the substantive language of, the treating physician rule. 77 Fed.Reg. 10651–10657 (Feb. 23, 2012). The current numbering is cited herein.

afford them controlling weight when they are inconsistent with the medical evidence, unsupported by medical signs or findings, or inconsistent with the record as a whole." (DE# 10 at 19, citing 20 C.F.R. § 404.1527(c)(2-4)). An ALJ has "the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011) (citing *Mastro*, 270 F.3d at 178). Here, the ALJ pointed to persuasive contrary evidence and sufficiently explained his reasoning.

As the Commissioner correctly points out, the ALJ explained that Dr. DeGarmo's own treatment notes and other evidence of record (including the medical records for Claimant's successful back surgery) did not support Dr. DeGarmo's opinion of extreme functional limitations. (DE# 10 at 20). For example, although Dr. DeGarmo indicated in his two-page RFC form that Claimant could only walk half a block without rest or significant pain (AR 553), the ALJ specifically discussed the fact that Dr. DeGarmo's own post-surgery notes from May, July, and September of 2013 repeatedly indicated that Claimant walked with a normal gait, had normal stability and range of motion, and had normal motor and sensory examinations. (AR 30, 525-27, 530, 533). Although Dr. DeGarmo circled "15 minutes" on the form, indicating that Claimant could only stand/walk for 15 minutes at a time (AR 553), Claimant herself admitted at the administrative hearing that she could stand for a longer time. (AR 71). Claimant told the treating surgeon that she had experienced significant relief of pain and weakness, and improvement in her standing posture after her laminectomy. (AR 503). Dr. DeGarmo's own notes reflect that Claimant reported "feeling a lot better" after her back surgery (AR 534). The Commissioner points that on January 31, 2013, Plaintiff had a seven-week follow up with Dr. Vanpelt, who noted that Claimant should continue walking as much as possible for exercise, could begin lifting heavier objects (i.e. more than 10 pounds), and do some gentle bending and twisting at the waist. (DE# 10 at 6-8, citing

AR 502). At such time, the treating surgeon also recommended that Claimant walk two miles daily and ride a stationary bicycle for exercise.

The ALJ specifically cited Dr. DeGarmo's own notes from check-ups in 2013 indicating that Claimant had a normal gait, normal station and stability, normal range of motion, normal muscle strength and tone. (AR 29-30, citing 16F). Such notes indicate that Claimant denied any back, joint, or muscle pain/weakness in her 2013 visits and that Dr. DeGarmo had repeatedly observed "normal tone, strength, and symmetry." (AR 528, 530, 532). At her 5-month follow up visit on May 2, 2013, Dr. Vanpelt observed "satisfactory postoperative appearance, patient reports improved walking distance and standing tolerance, symmetrical muscle strength and can ambulate without difficulty, mood and affect appropriate, overall, she is doing well." (AR 501, 5/2/2013 notes indicating patient was "alert and oriented, mood and affect are appropriate," x-rays showed "satisfactory" healing, patient reported improved walking distance and standing tolerance, and patient could continue activities as tolerated).

Claimant complains that the ALJ should not have relied on the treating surgeon's finding that Claimant had "symmetrical strength in all major muscle groups in both lower extremities and no difficulty with ambulation" because the treating surgeon did not provide an "exact measure of improvement." (DE# 9 at 26). Based on this over-stated premise, Claimant urges that "the fact that symptoms improved with surgery is not actually inconsistent with Dr. DeGarmo's opinions" of extreme physical limitations. (*Id.*). Such argument is conclusory and unpersuasive. Under the regulations, the ALJ has the exclusive responsibility to consider <u>all</u> the evidence, including conflicting evidence, and assess the Claimant's RFC. See 20 C.F.R. § 404.1546(c).[12] The ALJ

---

[12] Claimant cites *Kellough v. Heckler*, 785 F.2d 1147, 1153 (4th Cir. 1986) for the general proposition that "isolated references in the physician's notes to 'feeling well' and 'normal activity' are not a substantial basis for rejecting as incredible the claimant's subjective complaints of exertional limitation." Claimant's reliance on such case is

pointed to medical records showing that Claimant felt "much better" after her laminectomy, was walking for exercise, and had repeatedly "denied any back pain" (AR 30, citing Ex.13F). Dr. DeGarmo's own notes on 09/05/2013 indicate "patient denies back pain, joint pain, muscle pain, muscle weakness…patient here for refills. Feeling much better." (See Ex. 16F, AR 526, 532).

As for mental limitations, Claimant testified that she "went to mental health for a while" but "quit" treatment with Carolina Behavior and Dr. DeGarmo in 2008. (AR 57; and see AR 538 noting patient went for initial assessment but dropped out of treatment on 5/28/2008). After filing for disability in 2011, Claimant started seeing Dr. Chrys Harris in 2012. Claimant testified she saw this psychologist monthly for 9-10 months and that he prescribed medications that admittedly helped her. (AR 57-58, "I'm doing better with the medication he's got me on, yes."). Her husband also testified that medication had helped her. (AR 81).

To the extent Claimant disputes the weight assigned to Dr. DeGarmo's opinions (including any opinion of mental functioning), the ALJ specifically pointed to Dr. DeGarmo's own treatment notes repeatedly "showing that the Claimant was alert and oriented to person, place, and time and had normal recent and remote memory, appropriate mood and affect for situation, normal judgment and insight, normal attention span and concentration." (AR 29-30, citing Exhibit 16F; AR 526-533). Additionally, the hearing testimony indicated, and medical records reflected, that Claimant had responded well to medication for mental issues. (AR 29, 58, 81, 399-400).

Claimant alleges (based on evidence submitted after the ALJ's decision) that many of the recorded "normal" findings in Dr. DeGarmo's medical records were computer-generated and not "accurate." (DE# 10 at 20). In his post-decision "statement," Dr. DeGarmo states that he is a

---

misplaced. Under the facts of the present case, the ALJ did not merely rely on a vague reference to "feeling well" or "doing better." Moreover, such rationale pertains to credibility findings, not the weighing of a medical opinion.

"family doctor" and does not "focus much on mental status" in his records (AR 571-72). Dr. DeGarmo suggests that he did not always click on the psychiatric tab to update his records. (*Id*.). This argument is not persuasive, as it undermines the Claimant's own evidence. See 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, ... [and][t]he better an explanation a source provides for an opinion, the more weight" is afforded to that opinion.). Claimant has the burden to show disability. Although Claimant is essentially inviting the Court to reweigh the evidence, reweighing of the evidence is not appropriate. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (court should not reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner).

Moreover, the Commissioner aptly points out that Dr. DeGarmo's post-decision explanation about computer-generated mental impressions "has nothing to do with any physical findings." Dr. DeGarmo's handwritten notes (which were not "computer generated") frequently reflect a lack of any abnormal physical or mental findings. For example, at periodic check-ups, Dr. DeGarmo noted in October 2010 that Claimant was there for a cough and sore throat (AR 331), in December 2010 that Claimant had no abnormal physical findings upon examination (AR 330), and in August 2011 that Claimant had post-nasal drip (AR 329).

The ALJ also discussed the results of Dr. Kofoed's comprehensive consulting mental examination and evaluation, which did not support "work preclusive limitations" due to alleged mental impairments (AR 28-29, citing Ex. 4F). Dr. Kofoed observed that the Claimant "has not been in mental health care for the last four to five years," and was taking medication, i.e. Seroquel and Prozac. (AR 343). Although he indicated that Claimant "is likely to feel much more comfortable working independently…having relatively little interaction" with co-workers,

supervisors, and customers," the ALJ sufficiently accounted for this in his RFC assessment. (AR 95, limiting interaction with others).

The ALJ's decision provided legitimate reasons for declining to assign "some" weight to Dr. DeGarmo's brief opinions, in light of the opinion of the consulting examiner and other evidence of record. It is the ALJ's duty to resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456. As the Commissioner points out, the ALJ sufficiently explained his decision in light of the conflicting evidence. Substantial evidence supports the ALJ's RFC determination and the weight given to Dr. DeGarmo's opinions.

Claimant further urges that, in determining RFC, the ALJ made a "medical interpretation" of the records that he is "unqualified" to make. (DE# 9 at 30-32). On the contrary, the regulations provide that the ALJ has the exclusive responsibility to formulate RFC. See 20 C.F.R. § 404.1546(c). The regulations specifically explain that "[o]pinions on some issues ... are not medical opinions ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d).[13] In accordance with the applicable regulations, the ALJ appropriately determined the Claimant's RFC. *See, e.g., Dellinger v. Colvin*, No. 6:14–cv–1150-DCN-KFM, 2015 WL 5037942, *7 (D.S.C. Aug. 26, 2015) (finding that ALJ did not improperly substitute his opinion for that of the treating physician where the "ALJ provided numerous reasons why he decided to give "little weight" to [the treating physician's] opinion, including the contradictory evidence in the medical record"); *Shipman v. Colvin*, Case No. No. 5:14–cv–2700–DCN-KDW, 2015 WL 5691870, *6 (D.S.C. Sept. 28, 2015) (same).

---

[13] See SSR 96-5p ("Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner") for a discussion of the difference between the RFC assessment, which is an administrative finding of fact by the ALJ, and the opinion evidence called the "medical source statement."

Post-decision, Claimant submitted to the Appeals Council a two-page note dated June 24, 2014 and signed by Dr. DeGarmo, indicating he believes the Claimant is "totally" disabled (AR 576-77). Opinions by physicians on the ultimate issue of whether a claimant is disabled within the meaning of the SSA are considered but are not given controlling weight because the decision on that issue is dispositive and reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d)(1); SSR 96-8p, fn. 8 ("A medical source opinion that an individual is "disabled" … is an opinion on an issue reserved to the Commissioner.") The law does not give "any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(3).

**Issue 2: Whether the ALJ's Analysis of Dr. Harris's Opinion is Supported by Substantial Evidence**

Claimant also disputes the weight assigned by the ALJ to the opinion of psychologist Chrys Harris, Ph.D. (DE# 9 at 32-38). Claimant complains that the ALJ only assigned "some weight" to the opinion of this treating source, who according to Claimant, had described Claimant as only "mildly depressed." (*Id*. at 34).[14] Dr. Harris provided a brief summary of services in a two-page check-the-box form concerning Claimant's visit on May 2, 2012. (AR 346-347). With respect to Claimant's "emotional functionality," the form merely indicated "depressed mood." (AR 346). Dr. Harris later submitted another two-page "summary of services" concerning the period May 2, 2012 to May 7, 2013, which checked various boxes, but again, did not provide objective criteria for any

---

[14] Claimant's symptoms were improved with conservative treatment consisting of medication. *See, e.g., Owens v. Barnhart*, 400 F. Supp. 2d 885, 890 (W.D. Va. 2005) (claimant sought little mental health treatment aside from medication refills). "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986); *McCullough v. Colvin*, Case No. 1:12–208–MGL-SVH, 2013 WL 2285919, *5 (D.S.C. 2013) (ALJ properly considered "improvement while on medication"); *Foskey v. Colvin*, 2014 WL 1903340, *10 (E.D.Va. 2014) ("objective medical records showed that … compliance with medication regimens alleviated symptoms"). Claimant testified she is not fully compliant with her treatment. (AR 58-59, testifying that "sometimes I don't take it every day" and that "I don't like to take it;" AR 399 noting Claimant's "poor compliance" with medications in 2008).

findings. (AR 521-522). On 9/3/2013, Dr. Harris opined that Claimant had been misdiagnosed as bi-polar, and instead, had "complex PTSD." (AR 517). Dr. Harris a submitted a brief Medical Source Statement ("MSS") on September 3, 2013. (AR 513-515, Ex. 14F). In the MSS, Dr. Harris indicated that Claimant's "ability to understand, remember, and carry out instructions" was not affected by her impairments, but checked the box for "marked or extreme" in interacting with other people, responding to work pressures, and changes in routine. (*Id.*).

The ALJ indicated that this psychologist's opinion was inconsistent with other evidence of record, including the consulting examiner's comprehensive evaluation, the treating physician's repeated findings of normal mental status, and the Claimant's ability to engage in various activities of daily living, such as shopping. (AR 29, 342).[15] The ALJ observed that the testimony and treating medical records indicated that Claimant responded well to medication for mental issues. (*Id.*; AR 58, 81, 399-400). Although Dr. Harris indicated that Claimant had been misdiagnosed as "bi-polar" (AR 517, Sept. 3. 2013), Claimant nonetheless argues that the "ALJ failed to understand the nature of [Claimant's] impairment of bipolar disorder." (DE# 9 at 35). Hence, the medical evidence that Claimant relies on does not support her own argument.

In disputing the weight assigned to Dr. Harris' opinion, Claimant points to some past GAF scores. (DE# 9 at 32, 36-38).[16] A GAF score has "no direct legal or medical correlation to the severity requirements of social security regulations." *Powell v. Astrue*, 927 F.Supp.2d 267, 273 (W.D.N.C. 2013) (citing *Oliver v. Comm'r of Soc. Sec.*, 415 F.App'x 681, 684 (6th Cir. 2011)). "It is, instead, intended to be used to make treatment decisions." *Id.* at 273. While a GAF score

---

[15] Claimant also reported to the consulting examiner that she had good relationships with her children. (AR 341-43, Ex. 4F).

[16] See https://en.wikipedia.org/wiki/Global_Assessment_of_Functioning. A "Global Assessment of Functioning" score ("GAF") refers to a numeric scale formerly used by mental health clinicians to subjectively rate a single impression of a person's functioning.

may inform the ALJ's decision, "it is not essential to the RFC's accuracy." *Emrich v. Colvin,* 90 F.Supp.3d 480, 491-92 (M.D.N.C. March 2, 2015). In fact, the Diagnostic and Statistical Manual of Mental Disorders ("DSM") has abandoned the use of GAF scoring altogether. *Id*. (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013) (abandoning use of GAF scoring "for several reasons, including its lack of conceptual clarity ... and questionable psychometrics in routine practice").

In 2013, the SSA acknowledged that the DSM had abandoned the use of GAF scoring. The SSA advised ALJs that they could still consider GAF scores as opinion evidence in some circumstances. See Administrative Message 13066 (AM–13066), effective July 22, 2013 (explaining that "as with other opinion evidence, a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. Unless the clinician clearly explains the reasons behind the GAF score, and the period to which [it] applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.").

Although Claimant argues that the ALJ "failed" to evaluate her GAF scores, the ALJ's decision reflects otherwise. The ALJ specifically indicated that he was assigning "only some weight to the GAF scores in records from the Carolina Center for Behavioral Health. (AR 29, citing Ex. 8F). The ALJ noted that Claimant had testified that her symptoms improved with medication, and that the medical records reflected such improvement. The ALJ specifically referred to the Claimant's GAF score of 55 from Greer Medical Health Center and observed that such score was *prior* to the alleged onset date of disability. (AR 29). In sum, the ALJ sufficiently considered and discussed Dr. Harris' overall medical opinion, and the ALJ's decision to assign it "some" weight is supported by substantial evidence.

**Issue 3: <u>Whether the Additional Evidence Submitted to the Appeals Council Would Have Changed the ALJ's Decision</u>**

Social Security regulation 20 C.F.R. § 404.970(b) authorizes a claimant to submit new and material evidence to the Appeals Council when seeking review of the ALJ's decision. 20 C.F.R. § 404.970(b). Under Fourth Circuit law, the new evidence becomes part of the administrative record to be considered on review. *Wilkins v. Secretary, Dep't of HHS*, 953 F.2d 93, 96 n. 3 (4th Cir. 1991) (*en banc*). Evidence is new "if it is not duplicative or cumulative" and is material if there is "a reasonable possibility that the new evidence would have changed the outcome." *Id*. at 96. When the Appeals Council receives additional evidence but denies further review, the Court considers whether the ALJ's decision remains supported by substantial evidence in the record as a whole. 20 C.F.R. § 404.981; *Smith*, 99 F.3d at 638-39 (reviewing additional evidence presented to Appeals Council and affirming denial of benefits because substantial evidence support the ALJ's findings even with the additional evidence).

Here, Claimant submitted additional evidence to the Appeals Council, which made it part of the record. (AR 5). Specifically, Claimant submitted a post-decision "statement" by her family doctor Dr. DeGarmo and a letter from psychologist Dr. Crockett. The Commissioner correctly points out that the sworn statement consists largely of answers to leading questions by Claimant's counsel. The Commissioner asserts that there is not a reasonable probability that the additional evidence would have changed the ALJ's decision, given the evidence of record, including the normal findings throughout Dr. DeGarmo's hand-written notes and the findings of consistent post-surgery improvement in Dr. Vanpelt's treating records. (DE# 10 at 22-23). The letter from Dr. Crockett merely indicates that she wished to add a diagnosis of "complex PTSD" as of September 2014, which is after the ALJ's decision. (AR 7). The Commissioner asserts that Dr. Crockett's

letter is largely based on unsupported speculation about the time period *after* the ALJ's decision. (DE# 10 at 3, 27). "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). The Commissioner points out that "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied." (*Id.* at 28, quoting *Moats v. Barnhardt*, 2006 WL 1134078, *7 (W.D. Va. Apr. 25, 2006)). Dr. DeGarmo's statement and Dr. Crockett's letter would not have changed the outcome of the ALJ's decision. Even with such additional evidence, the ALJ's decision is supported by substantial evidence. Remand is not warranted.

## V. Recommendation

Accordingly, the Magistrate Judge recommends that the Commissioner's final decision is supported by substantial evidence and should be **affirmed.**

                                                  _____
                                                  MARY GORDON BAKER
Charleston, South Carolina            UNITED STATES MAGISTRATE JUDGE
November 1, 2016